THE BOARD OF COMMISSIONERS OF MARION COUNTY V. THE BOARD OF COMMISSIONERS OF HARVEY COUNTY.

1. DETACHED TERRITORY, *to Contribute to Payment of Bonds.* Prior to 1873, Marion county issued certain bonds for the purpose of building bridges in the county. In that year one township was detached from Marion and attached to Harvey county. None of the bridges built out of the proceeds of said bonds were within the limits of this detached territory. *Held,* Under chapter 142, Laws of 1873, that this fact did not either legally or equitably relieve the detached territory from contributing to the payment of these bonds.

2. ORIGINAL §§ 51, 52, 53, CH. 23, GEN. STAT. 1868, AND AS AMENDED, *Valid.* Chapter 23 of the General Statutes of 1868 is entitled "An act concerning private corporations," and was intended to comprise within its limits the entire body of statute laws concerning private corporations. It names the purposes for which they may be formed, prescribes the manner of their organization, defines their powers and duties, and provides for their dissolution; and in addition thereto, it contains several separate articles devoted to particular classes of corporations, such as insurance, railroad corporations, etc. Article 6 is thus devoted to railroad corporations, and in addition to the general powers of other corporations, gives them power to condemn land for the right of way and to receive subscriptions of municipalities to their stock. It also prescribes the manner and conditions under which these powers may be exercised. In 1869 the sections providing for municipal subscriptions were amended by an act devoted entirely thereto, and entitled "An act to amend sections 51, 52 and 53 of an act entitled 'An act concerning private corporations.'" While municipal bonds, as such, are not so connected with the subject of private corporations that we may look for provisions concerning one in an act devoted to the other, yet in an act concerning the latter, we may fairly look for provisions concerning subscriptions to stock, even though made by municipalities, and to be paid for by municipal bonds. *And, held,* That neither the original sections nor the amended act are unconstitutional, nor in conflict with section 16 of article 2 of the constitution, which provides that "no bill shall contain more than one subject, which shall be clearly expressed in its title."

3. FUNDING BONDS, *a Charge Against Detached Territory.* Certain railroad bonds were authorized and issued by the county of Marion prior to the detachment of the township above mentioned. By virtue of an act of the legislature of 1879, and after the detachment, the county of Marion took up these railroad bonds, and issued funding bonds in lieu thereof. Certain changes were made in the time, the amount and the rate of interest of these bonds—changes all beneficial to the county. *Held,* That though these funding bonds were technically both authorized and issued

after the detachment, yet, within the spirit of the law, and legally, the funding bonds are a charge against the detached territory, the same as the railroad bonds had been.

4. ORIGINAL CASE IN SUPREME COURT; *Agreed Facts; Practice.* In an original case in this court, where the parties agree upon certain facts, and submit the case upon that agreed statement, subject to all objections on account of incompetency, *held,* that no fact in such agreed statement will be considered by this court which does not affect some one of the issues tendered by the pleadings.

5. TAX IN DETACHED TERRITORY; *Certificate of County Clerk.* It is not essential that the certificate of the county clerk required by § 4, ch. 142, Laws of 1873, should state all the circumstances in connection with the original indebtedness which justify a levy of taxes upon the detached territory. It is enough if it states in general terms the debt, describes the territory, and gives the rate per cent.

6. TAX IN DETACHED TERRITORY; *Levy and Certificate, Valid.* Where, in making a levy, the county commissioners, having the assessed value of all the property before them, instead of in terms determining the amount of money necessary to be raised, simply prescribe the rate per cent. of tax to be levied, *held,* that even if this be a technical non-compliance with the letter of the statute, it is not such a substantial defect as will vitiate the levy, and render illegal the certificate sent to the county clerk of the county in which the detached territory lies.

7. LEVY, *When not Illegal for Excess, etc.* A levy will not be adjudged illegal because upon computation it appears that, if all the taxes are promptly paid, a sum slightly in excess of that needed for the specific debt will be raised. The probability of a delinquency is a matter which may fairly be considered by the commissioners in determining the amount of the levy.

### Original Proceedings in Mandamus.

ON the 13th of September, 1880, on the petition of the *Board of Commissioners of the County of Marion,* an alternative writ of mandamus was issued out of this court and directed to the *Board of Commissioners of the County of Harvey,* to compel the latter to extend upon its tax roll, so far as it affects certain lands, a levy made by the former, or to show cause, etc. The defendant board answered, showing cause. The facts are sufficiently stated in the opinion.

*Frank Doster,* and *C. Reed,* for plaintiff, reviewed the twenty-three paragraphs of the answer, and contended that

so far as the bridge bonds are concerned, no defense requiring further examination and discussion has been interposed.

The original bonds were issued under ch. 29, Laws of 1869, the title of which is "An act to amend §§ 51, 52 and 53 of 'An act concerning private corporations.'" The act of which it is amendatory is entitled "An act concerning private corporations." It is contended that the subject of municipal aid to private corporations is not expressed in the titles to these acts. The law of municipal bonds may be viewed with reference to the power to *issue* them, and also with reference to the power to *receive* them; with reference to who can execute and who can accept.

The power to receive municipal aid involves the correlative power to grant the same. An act, therefore, which authorizes the acceptance of municipal aid, the subject of which authority is expressed in its title, is also an act which authorizes the granting of such aid; and as the powers of gift and acceptance are correlative powers, the subjects of both are expressed in the title. The reverse of these propositions is equally true, and may be stated for the sake of bringing the point more clearly into view. A denial of the power to accept municipal aid involves a denial of the power to grant the same. An act, therefore, which denies the power to accept municipal aid, the subject of which denial is expressed in its title, is also an act which denies the power to grant such aid; and as the powers of gift and acceptance are correlative powers, the subjects of both are expressed in the title. The propositions thus advanced we believe embody the reasoning of the courts, whose opinions in analogous cases are relied upon as sustaining the views of plaintiff in this case.

The subject of the acceptance of municipal aid is, we think, without doubt expressed in the title to the acts in question; if so, the correlative subject of the granting such aid is also expressed. True, neither subject is as clearly expressed as it might have been; but the question of how clearly it shall be expressed is for the legislature to determine. All that is mandatory to the legislature is the obligation to *express* the

title; the degree of clearness with which it shall be expressed is committed to its discretion.

If the original act of 1868 was the first instance in the legislation of the country in which power was given to issue municipal bonds, greater reason would exist for the support of defendant's theory; but the history of legislation for years past in our own state, and probably in all the other states, shows that private corporations have constantly been made the recipients of municipal aid, generally by acts the titles of which indicate the subject of issuance with its correlative of acceptance, but not unfrequently by acts the titles of which indicate the subject of acceptance with its correlative of issuance, as is instanced by some of the cases already cited to the court. So general and notorious had become the custom to authorize the extension of public aid to private corporations, that an inquirer into legislative action upon this matter, failing to find the subject of issuance involved under the titles to acts concerning the powers of public corporations, could not be excused from examining under the titles to acts concerning the powers and privileges of private corporations. A case as nearly in point as any to which the court has been referred, is *Foster v. Callaway Co.*, 3 Dill. 200.

But conceding that the original bonds were invalid, for the reason assigned by counsel, are the funding bonds likewise invalid? These last bonds were issued under ch. 50, Laws of 1879. We contend that the indebtedness contracted by the county under the act of 1869 was validated by the later act, or rather became valid under the action of the county taken in pursuance to that act.

The unauthorized issue of municipal bonds may occur from one of three causes: first, lack of power in the legislature to confer the authority; second, failure of the legislature to confer the authority; third, defective execution of the authority. If the first of these causes exists, no subsequent legislative or municipal action can cure the defect; if the second cause exists, no subsequent municipal action can cure the defect; if the third cause exists, the bonds are affected according to

the character of the acts or omissions constituting the defects, or as to whether they are in the hands of *bona fide* holders or otherwise. To the effect of the second of these causes our attention only need be directed. That the unauthorized issuance of municipal bonds may under some circumstances be validated, no one will deny. If issued without previous legislative sanction, they may be validated by legislative sanction subsequently obtained, is the settled rule in the federal courts, and also in most of the state courts. That sanction may be in the form of retrospective legislation operating upon the original agreement, giving it binding force; or it may be in the form of authority to the municipality to recognize the binding force of the original agreement. It may be in the form of express statutory provisions, or in a form from which legislative intention may be inferred. The legislature can ratify and confirm what it could have originally authorized; and it can make no difference whether the defect arises from a refusal to exercise its power, or from a failure to render effectual an attempted and supposed exercise of such power. (Cooley on Const. Lim. *379; Clemens on Corp. Securities, 41, in which the federal decisions are collected and discussed.) The case of *The City v. Lamson*, 9 Wall., is precisely in point upon principle and in similarity of facts. (See also Chase's Decisions, 555; 19 Iowa, 225; 98 U. S. 308.) Compromising and funding invalid municipal obligations, under an agreement for an extension of the time of payment, is a ratification of the original act of issuance. (*Campbell v. City of Kenosha*, 5 Wall. 204.)

In the case under discussion the question of the validity of the original bonds had been affirmatively decided by the supreme court of the United States before the funding bonds were issued. (*Comm'rs of Marion Co. v. Clark*, 94 U. S. 282.) True, it does not appear that the precise objection urged in this case was made in that one, or that the pleadings were such as to permit it to be made, so as to now be considered *res adjudicata;* but there was litigation over a *disputed claim*, and that, within the decisions of all the courts, is a sufficient

consideration for the settlement of such claim. In that litigation the interests of the detached real estate were involved. It was, if the expression be allowable, a party thereto, represented by its agents. The judgment in that case is conclusive in favor of the opposite party, upon every question therein determined, or that might under the pleadings have been determined.

If the legislature, as in the cases before cited, could impose upon municipalities a ratification of their defective, illegal, or unconstitutional bonds, with how much less question can the legislature enact a law giving to municipalities the right to ratify their past illegal agreements? It can be held, within the principle of *The City v. Lamson,* supra, that the enactment of the funding law, *proprio vigore,* validated the original bonds, but it is not necessary to go to that extent. In *Hasbrouck v. Milwaukee,* 13 Wis. 42, it is held that in order to be effectual the legislative ratification must have been procured by the municipality, or must afterward be assented to, and acted upon by it. The decision in *Comm'rs of Shawnee Co. v. Carter,* 2 Kas. 115, is not opposed to the views herein expressed. The act in that case was a curative act, proper in form.

But it is claimed that, conceding the funding bonds to be valid, they were not under the terms of ch. 142, Laws of 1873, "previous to the change of boundary lines, legally authorized and issued by a vote of the electors;" and *Chandler v. Reynolds,* 19 Kas. 249, is relied upon in support of such claim. In that case the bonds were authorized previous to the change, but were not issued until afterward. At the time of the change there were no municipal obligations constituting a lien upon the real estate. The township had made a promise to issue bonds, but it had not been fulfilled; the time for its performance had not arrived. It might never have been performed. When the bonds were issued, the real estate of the detached territory was situate in another township, which had a perfect municipal organization of its own, as independent of the old township as though no other relation had ever existed between them. When the bonds were issued it

was done by the old township, which had a like perfect and independent organization. They were issued as the obligations of the old township. No lien was created until they were issued, and upon no legal principle could the real estate of the new township be held liable.

In the case under discussion the original bonds were issued previous to the division, and in pursuance of a vote of the electors, and the question is, whether the county can fund such bonds and retain its right to contribution from the detached real estate. The indebtedness is the same in both cases. The form of the evidence of indebtedness only is changed. That change was made by competent authority, by the agents having in charge the interests of the detached real estate. For all the purposes of the payment of the indebtedness, the detached real estate remains a part of the county from which it was detached. This is expressly declared in *Commissioners of Ottawa Co. v. Nelson*, 19 Kas. 245. The detached real estate, which alone is affected, has no corporate existence. It is situated in a township corporation, but it is not a corporation itself. (*Fender v. Neosho Falls Township*, 22 Kas. 311.)

So far, then, as the indebtedness in question is concerned, the detached real estate is still a part of Marion county, represented upon all matters pertaining thereto by the same agents as Marion county, and liable along with it for the payment of all obligations legally incurred prior to the division. The bonds that were funded were the bonds of the detached real estate, and upon no principle of statutory construction can it escape a liability incurred in its behalf, for its benefit, by its legally authorized agents.

The statute in question extends to the case of bonds not authorized or issued previous to the division, if executed in renewal of bonds that were so previously authorized and issued. (Vattel's Rule, 22; Dwarris, 129, 235.)

*John Reid,* for defendant:

1. We do not think that ch. 142, Laws of 1873, enables the plaintiff to require the defendant, by mandamus, to levy taxes

to reimburse the plaintiff for what it may have paid either on the bridge bonds, or upon the funding bonds. Besides, the plaintiff does not claim to have paid such taxes, nor does it say that any interest or principal of said bridge bonds due in 1878, 1879, 1880, remains unpaid. The statute was intended to enable the county to require the detached territory to assist in *raising* the necessary amount of money to pay the interest and principal of bonds, and not to enable the county to *reimburse* itself for moneys paid on such bonds. If the plaintiff chose to pay the debt of the detached territory, without the request of the territory, or the defendant, it was a voluntary payment, and cannot be recovered.

2. The only questions for consideration, so far as the bridge bonds are concerned, are, the question of fact whether or not the levies for 1878, 1879 and 1880 were certified to the county clerk of Harvey county as required by law, and the question of law as to whether the law authorizes the levy of more than one year's taxes at one levy. This question of law is the only one for discussion on the present hearing, and it seems to us that it cannot be satisfactorily determined without knowing whether, as a matter of fact, the levies were each year certified to the clerk of Harvey county; for we will concede it to be probable that the plaintiff can compel all three of the levies to be made in this proceeding, if the levies were proper, duly certified, and remain unpaid. It will never do to urge that ch. 142, Laws of 1873, authorizes the plaintiff to compel the detached territory, in this kind of a proceeding, to repay the plaintiff any portion of the interest or principal of bonds legally authorized and issued by the plaintiff prior to the passage of the act detaching such territory, and paid by it out of its treasury.

3. Were the original bonds issued and delivered to the Kansas & Nebraska Railroad Company valid? Is the territory detached from Marion county and made a part of Harvey county liable to contribute under the law to the payment of the funding bonds issued by Marion county, and mentioned in the writ? Chapter 29, Laws of 1869, under which the

bonds in both cases were voted and issued, violates §16 of article 2 of the state constitution. (32 Ill. 181; 11 Ind. 199; 44 Iowa, 88.) Prior to the passage of that chapter, cities, counties and towns were not authorized to pay their subscriptions to the stock of any railroad company with their bonds. That power was conferred and exists, if at all, by force of said chapter. Section 53 of the act "concerning private corporations" authorized the raising of funds to pay installments by the issuing of bonds or the levying of a tax. But under § 53, as amended by ch. 29, Laws of 1869, it is made the duty of the board of county commissioners, or city council, or trustees of the town making the subscription, to pay for the same and the stock thereby agreed to be taken, by issuing *to the company* entitled thereto, the bonds of such county, city or town. We think the titles to both the amending and amended acts may be laced together by the most ingenious sophistry, hammered and stretched to their utmost tension, and still they will fail to cover or include within them the power granted to counties, cities and towns to pay for their subscriptions to the stock of railroads with their bonds. It will not do to say that provided they got par for them, they might have done the same thing under the original section, for this power of taking stock in railroad companies and paying therefor with funds raised by the issuing of bonds, would not be followed by an exchange of the bonds for the stock. (23 N. Y. 439.)

It seems, then, that at the time these bonds were issued to the Kansas & Nebraska Railroad, the legislation on that subject was not so well settled and fixed as counsel apprehend it was, and hence all their argument to the effect that the correlative power to "give and receive," as they put it, had long been recognized in the legislation of the state, must fall to the ground.

How counsel can insist that an act entitled "An act to amend sections 51, 52 and 53 of an act entitled 'An act concerning private corporations,'" has a title sufficient to authorize counties, cities and towns to subscribe for stock in a railroad company, issue their bonds to the company in payment there-

for, and levy taxes to pay the interest and principal of such
bonds, is truly remarkable.   It is true that courts have held
that acts whose titles provide for the organization of a par-
ticular railroad corporation only, are sufficient to authorize
counties to subscribe to the capital stock of such company;
but it must be remembered that such acts were passed in
states where there was no general law providing for the or-
ganization of such companies, and that such is not the sort of
a title under consideration.   We are no more authorized to
say that an act "concerning private corporations" provides
for the organization of railroad companies, than that ch. 110,
Laws of 1871, provides for the creation of notaries public,
because the title thereto is "An act concerning notaries pub-
lic."   Besides, the legislature of Kansas has no authority to
pass an act to incorporate a particular railroad corporation,
for all corporations must be organized under a general law,
and hence much of the force of decisions made on special acts
of incorporation is lost in this state, because the enacting of
such special laws is at variance with its policy.   No one, we
think, will claim "An act concerning private corporations"
embraces, as is said in 3 Dillon, 200, "but one subject, when
viewed with reference to the matter in hand, viz., the build-
ing of a railroad," because the matter in hand, as manifested
in that title, is the various private corporations of the state;
and it is just as plausible to say that under that title a county
may take stock in a bank as in a railroad company, or in
fact, in any other of the thirty-nine kinds of corporations
that may be organized under the "Act concerning private
corporations."

4. Admitting for the sake of argument that said bonds are
valid, still the detached territory cannot be compelled to pay
any portion of them.   Sec. 1, ch. 142, Laws of 1873, reads:
"All bonds heretofore or hereafter legally authorized and
issued by a vote of the electors in any county or township,
shall become and be a lien upon all the real estate in such
county or township for the payment of the principal and in-
terest of *said bonds;*" and we observe that the bonds must

be legally authorized and issued by a vote of the electors in
the county before they become a lien upon the real estate of
the county or township.  These funding bonds were not
issued by a vote of the electors of the county of Marion.
Not having been so issued, they are no lien upon the real
estate in the township of Walton, the territory detached from
Marion county in 1873, and made a part of Harvey county.

Sec. 3, ch. 142, Laws of 1873, tells what kind of bonds
Marion county can call upon the detached territory to assist
in paying.  They must have been legally authorized and
issued prior to the change of boundary lines.  They must
have been authorized and issued by a vote of the electors.
Are these funding bonds issued by the commissioners of
Marion county in 1879 and 1880 such bonds?  Certainly
not.  The territory was detached in 1873, and the bonds
were not issued by a vote of the electors.  However, counsel
think that "beyond doubt" Marion county, although she has
funded the bonds issued to the Kansas & Nebraska railroad
company, has not thereby lost her control over the detached
territory, now Walton township in Harvey county, and that
it is still the same debt in a different form, and that the board
of commissioners of Marion county is still the agent of Wal-
ton township, and may do any and all things it may see fit
in regard thereto; that for the purposes of paying the debt,
Walton township is still a part of Marion county; and
*Comm'rs of Ottawa Co. v. Nelson,* 19 Kas. 245, *Fender v. Neo-
sho Falls Township,* 22 Kas. 311, are cited to sustain the
position.  We admit that the commissioners of a county from
which territory has been detached, have control of the de-
tached territory for the purposes mentioned in § 4, ch. 142,
Laws of 1873, and for none other, to wit: to determine the
per centum of tax to be levied on the detached real estate for
the payment of any bonds, or the interest thereon, which
were legally authorized and issued by a vote of the people
while such territory was a part of such county; and we deny
that the two decisions of this court referred to by counsel say
anything more.

If the detached territory could not be required under the law of 1873 to contribute to the payment of such bonds as are mentioned in the writ, to wit, the funding bonds, had they been issued before the territory was detached, by what process of reasoning can it be held liable on such bonds if issued after it is detached? (*Chandler v. Reynolds*, 19 Kas. 249.)

5. If there is any law compelling detached territory to contribute to the payment of funding bonds, such as are mentioned in the writ, issued by the old county or township after the territory is detached, it must be ch. 50, Laws of 1879. From §1 of this chapter, we may infer that every county is authorized and empowered to compromise and refund *its own matured and maturing* indebtedness, of every kind and description whatsoever — the words "of every kind and description" referring to "matured and maturing indebtedness," of course. That bonds only, with their coupons, are within the act, is clear from the fact that only such instruments as had been issued for the payment of money at some future date can come within the meaning of the words "matured and maturing," and these evidences of debt must be such as have *matured, or are maturing* — that is, are falling due, in the common acceptation of these terms, and not such as have many years to run (as twenty years), which was the case with the bonds funded by Marion county. Another warrant for saying that bonds only, with their coupons, are within the act, is, that such instruments are the only kind which the commissioners of a county can issue for the payment of money at some future day; and further, the evidences of debt refunded are to be surrendered for cancellation, to be marked, "Paid in full," and filed in the clerk's office. (Laws of 1879, ch. 50, §4.) Hence we say that county warrants, judgments, costs of litigation, attorney-fees, and the like, cannot be refunded under the act. Marion county had no authority to refund such items for herself, to say nothing about the detached territory. That Marion county cannot require the detached territory to assist in paying these funding bonds, is shown by §7 of said

chapter. Another reason why Marion county had no right to issue these funding bonds under that law is found in § 11 thereof. And further, the same legislature that passed ch. 50, Laws of 1879, gave its construction of that chapter in this particular, in the passage of an act for other territory, which would have met this case exactly, being ch. 52, Laws of 1879. Neosho Falls township had issued bonds; a new township was created, called Everett, from Neosho Falls and Liberty townships, and this act provides how the bonds issued by Neosho Falls township before the territory was detached should be paid by the people living on the territory constituting Neosho Falls township at the time they were voted.

These funding bonds, as the law now stands, are the obligations of Marion county, as defined and bounded when they were issued.

6. Ch. 50, Laws of 1879, is not an act validating, *proprio vigore*, all bonds illegally authorized and issued; nor is it such an act as authorizes a county to make legal, bonds which are illegal, by merely refunding them. If the bonds issued were issued in violation of § 16, article 2 of the constitution, how can the legislature remove that constitutional barrier? Such bonds can never be made valid by legislation. No case has been cited, and none can be found, where a court ever held that such a thing can be done. In *City v. Lamson*, 9 Wall. 477, no such doctrine is announced as is contended for by the plaintiff. The case of *Evans v. City of Richmond*, Chase's Decisions, cited by the counsel, does not strike us as law. It is held in *Williamson v. City of Keokuk*, 44 Iowa, 88, that bonds issued *ultra vires* are not legalized by any act which simply seeks to cure the defect, in the exercise of the power to issue them. In *Reynolds v. Nichols & Co.*, 12 Iowa, 398, it is held that paper issued by a corporation, while the constitution of the state prohibits the issuing thereof, does not become valid by reason of the adoption of a constitution removing the prohibition and the passage of laws providing for the issuing of just such paper. (6 Iowa, 304.)

*Campbell v. City of Keokuk*, 5 Wall. 204, is one of the prin-

13 — 26 KAS.

cipal supports of plaintiff; yet upon an examination of *Fisk v. City of Kenosha*, 26 Wis. 23, where the same matter is under discussion, and in which reference is had to the Campbell case, *supra*, we find how worthless it is. It will be found that the supreme court of the United States, finding two acts, under one of which the scrip could have been issued, held that they should infer that the scrip was issued under that, rather than under the other act, which was void, not knowing at the time that the city had exhausted its power under the valid act. It will there be found, too, that the language of the statute, from which a ratification of the illegal issue is subject to be drawn, does not have that effect, and that the case should not be cited as an authority.

The remarks of counsel touching the decision in *Comm'rs of Marion Co. v. Clark*, 94 U. S. 282, are neither warranted by that decision nor upon principle. The question raised here, they admit, was not passed upon by the court—in fact, was not raised by the pleadings.

The case of *Hasbrouck v. City of Milwaukee*, 13 Wis. 42, cited by counsel, is of no service to them in this case, until it is settled that the legislature, by ch. 50, Laws of 1879, made valid and binding all illegal issues of bonds by municipalities prior to its passage, and that the bonds in question are included, and that the plaintiff could bind the detached territory in funding them.

The opinion of the court was delivered by

BREWER, J.: This is an original action in this court, brought by the board of county commissioners of Marion county against the board of county commissioners of Harvey county, to compel the latter to extend upon its tax roll, so far as it affects certain lands, a levy made by the former. It appears that in 1873, by an act of the legislature, a certain strip of land was detached from Marion and attached to Harvey county, and the object of this action is to compel such detached territory to bear a portion of the indebtedness incurred by Marion county prior to such detachment. This debt is of two classes:

in 1871, Marion county issued $13,000 of bonds for the purpose of building bridges in the county; on the 30th day of September, 1872, Marion county issued $100,000 of bonds to the Kansas & Nebraska railroad company. To compel contributions to the payment of these two debts is the purpose of this action. The bridge bonds were due in 1881, and it does not appear that their validity as a debt of Marion county was ever questioned. The Kansas & Nebraska railroad was never built; Marion county denied the validity of those bonds; suit was brought thereon in the U. S. circuit court, and judgment rendered against the county. Thereafter, in 1879 and 1880, Marion county compromised with the holders of said bonds, coupons and judgments, and issued funding bonds in lieu thereof. These funding bonds were issued under the authority of chapter 50 of the Laws of 1879. The answer of the defendant sets up twenty-three different defenses; some of these, however, are waived by the defendant, and the agreed statement of facts eliminates certain others from consideration.

Several questions, however, of difficulty and importance remain to be considered; and first, we shall notice those having special reference to the bridge bonds. The validity of these bonds as an indebtedness of Marion county is not questioned. It is insisted, however, that none of the bridges for which these bonds were issued were built within the limits of the detached territory; and it seems to be suggested that this fact makes some sort of an equitable defense. That is a mistake. The bonds, when issued, were bonds of the entire county. The bridges, when built, were the property of the county, and wherever located were located for the benefit of the entire county. Every inhabitant of the county, and every tract of land in the county, had not only technically an interest, but in fact actually received a benefit from such bridges. Indeed, it is generally true that every improvement of the highways within or near any particular strip of land is an actual benefit thereto; and though this particular strip of land may now be attached to a different county, it is just as near as ever to those bridges, and receives as much as ever the benefit of the

highways improved thereby. At the time of the detachment, the bonds were both legally and equitably a charge against this territory; and the fact that the political relations of this territory have been changed affects neither the legal nor equitable liability.

**1. Detached territory to contribute to payment of bonds.**

This is the only question as respects the bridge bonds, except those involved in the form of the certificate and the manner of the levy, and those questions will be considered hereafter.

In respect to the railroad or funding bonds, it is insisted that the bonds as originally issued were invalid, because the act under which they were issued was unconstitutional; and further, that even if they were valid, they have all been paid by the funding bonds, and that these latter, issued in 1879 and 1880, are a debt incurred since the detachment, and therefore not a debt for which the detached territory is liable.

The first part of § 16 of article 2 of the constitution of Kansas reads as follows: "No bill shall contain more than one subject, which shall be clearly expressed in its title." This is the provision of the constitution which defendant claims is violated by chapter 29 of the Laws of 1869, under which the bonds were voted and issued, the title to that chapter being, "An act to amend §§ 51, 52 and 53 of an act entitled An act concerning private corporations.'"

Aside from the general doctrine that acts of the legislature should not be pronounced unconstitutional unless clearly in conflict with that instrument, and that questions of doubt should be solved in favor of their validity, there are many special reasons why the validity of these challenged sections should be maintained. On the faith of them, large property rights have been created, important enterprises conducted to completion, and the material prosperity of this state largely affected. For years they have stood unchallenged. It has been assumed that they are valid, and on that assumption many have acted. To now hold them invalid, would jeopardize large interests, introduce great confusion into affairs, and lead prudent men to hesitate about business enterprises in this state. It would shake faith in law, if sections of a

statute, upon which for a dozen years so many and so large interests have been unhesitatingly founded, and which have been so universally known, and so universally assumed to be valid, were swept away by a decision of the courts, based upon a technical non-compliance with some section of the constitution.

Doubtless the section of the constitution is mandatory; its provisions may not be disregarded by the legislature, and must be enforced by the courts; but as often said, its provisions are to be liberally and reasonably construed. It was put into the constitution in the furtherance of justice and to prevent tricks and frauds; to guard against surreptitious and hasty legislation; and should be so construed and enforced as to carry out the purpose of its enactment. To apply it, as counsel now contends that it should be applied, would in fact make it an instrument of injustice; would be applying it not as a guard against surreptitious legislation, but to overthrow deliberate and considered legislation, and legislation upon which vast rights have been founded; courts may well hesitate before they carry this section to such results. (*Woodruff v. Baldwin*, 23 Kas. 491.) That this was not surreptitious legislation, is demonstrated by the fact that in this amendment of 1869, the sole thought of the legislature—the sole object of the amendment—was the three challenged sections. Further than that, the amending act shows that the subject received the second and special consideration of the legislature. The question of the constitutionality of these sections is the same as though no amending act had been passed, and as though we were considering the original sections in the act of 1868.

Passing now to the specific objection, and it is this: The title of the act (ch. 23 of the General Statutes of 1868) is "An act concerning private corporations." This chapter is a general act concerning private corporations; gives the purposes for which they may be incorporated, and the manner of incorporation; their powers and duties; provides for their dissolution; and also contains several special articles devoted to particular classes of corporations. Article 6 is thus de-

voted to railroad corporations, and in addition to the general powers of other corporations, gives them power to condemn the right of way, and also to take subscriptions to their capital stock from municipalities, and prescribes under what conditions such subscriptions shall be voted and received. The constitutionality of these latter provisions is what is challenged.

It is said, "There is no mutual or necessary relation, either direct or indirect, between the organization of private corporations, their powers or their duties, their success or their usefulness, and the bonds of municipalities." Hence the matter of municipal bonds was neither clearly expressed nor suggested by a title which simply reads, "concerning private corporations." Private corporations and municipal bonds are two entirely different and not related subjects; under the title of municipal bonds we have no right to look for anything concerning private corporations, and *vice versa*, under the title private corporations we are to look for nothing concerning municipal bonds. As thus stated, there is a plausibility and a force which demand examination. The title to the act, it will be noticed, is broad and comprehensive; it is an act "concerning private corporations," not concerning the organization of corporations, not concerning their powers and duties, not concerning their dissolution, nor concerning the purposes for which they may be formed, but generally concerning the private corporations themselves. Not only is the title thus broad and comprehensive, but the act is also equally comprehensive; it contains 134 sections, and was intended to comprise within the limits of a single chapter the whole law concerning private corporations. Such a compilation is justifiable and proper, even as in the code of civil procedure are found provisions concerning limitation, concerning evidence, mechanics' liens, their formation as well as their enforcement, divorce and the causes therefor; mandamus and the cases in which it may be issued, etc., etc. Now a part of the law concerning corporations touches their organization — how it is to be effected, the amount of stock, when and by whom it may be subscribed,

for and under what circumstances and in what kind of property subscriptions may be paid; and the latter is really all that these challenged sections provide. The fact that, as respects railway corporations, special provisions are made for subscriptions, does not take such provisions outside the subject-matter of private corporations. They are just as much a part of the law concerning private corporations as the general provisions of that chapter in respect to subscriptions to all corporations. Indeed, a law concerning private corporations which made no provision for subscriptions thereto, would seem to be deficient; and if the legislature may make general provision concerning subscription, it may also make special provisions. One is as much suggested by the title as the other. Suppose beyond the general provision as to subscriptions, the act specially provided that subscriptions to bank corporations should be paid in full in cash at the day of subscription, or that no non-resident or alien should be permitted to take stock in insurance corporations, or that no minor should be allowed to take stock in any corporation, without attaching thereto a certified copy of the order of the probate court of his county, allowing such subscription, or that the subscription of no married woman should be received without a written assent of her husband thereto: would any of these special provisions be held to be so foreign to the subject-matter of the organization of corporations as not to be included within the general title to that chapter? It seems absolutely clear, that if provisions concerning subscriptions to the capital stock of the corporation may be included in an act with this general title, that the detail and extent of such provisions is a matter of legislative discretion, and cannot be challenged in the courts. It cannot be said that one form of subscription and subscription by one set of parties are included within the title, while other forms of subscription, and by other parties, are not so included. These challenged sections simply provide that municipalities may subscribe, when they may subscribe, and how they may subscribe, and how they may pay their subscriptions; and this comes fairly within the subject-matter of the organization of

private corporations, and is included within the general title of this chapter. We conclude, therefore, that these sections are not unconstitutional, and that so far as this question is concerned the original issue of railroad bonds constituted a valid debt of Marion county. See, in addition to the decisions of our own court, the following authorities: *Foster v. Callaway County*, 3 Dillon, 200; Dillon on Municipal Corporations, § 28, and note; Cooley's Const. Lim., p. 144; *San Antonio v. Mehaffey*, 6 Otto, 312; *Phillips v. Town of Albany*, 28 Wis. 340; *Phillips v. C. & C. B. Co.*, 2 Metc. (Ky.) 219; *Supervisors v. The People*, 25 Ill. 181; *Home's Appeal*, 77 Pa. St. 77; *People v. Briggs*, 50 N. Y. 553; *Brewster v. City of Syracuse*, 19 N. Y. 116; *Evans v. Sharp*, 29 Wis. 564; *Mills v. Charelton*, 29 Wis. 400; *Humboldt County v. Churchill County*, 6 Nev. 30; *State, &c., v. Union, &c.*, 33 N. J. 350.

2. Original §§ 51, 52, 53, ch. 23, Gen. Stat. 1868, and as amended, valid.

Again, it is insisted that, conceding the validity of the railroad bonds as originally issued, the funding bonds were neither authorized nor issued till long after the detachment, and that therefore, under the authority of *Chandler v. Reynolds*, 19 Kas. 249, the detached territory is not liable. In that case, certain bonds were authorized before, but were not in fact issued till after the division, and the detached territory was held not liable. See also the case of *Comm'rs of Sedgwick County v. Bunker*, 16 Kas. 498. Looking to the letter simply, these funding bonds were neither authorized nor issued till after the detachment; hence apparently the detached territory was not liable. But looking behind the letter to the substance, we find that, before the division, the railroad bonds were in fact authorized and issued. At the time of the division, therefore, the debt thus created was a lien upon the detached territory. (Laws of 1873, ch. 142, § 1.) The same liability was also affirmed by § 2 of ch. 59 of the Laws of 1873, an act which provides for the detachment, and which in said § 2, reads: "*Provided*, That nothing in this act shall be construed to release townships one and two, east, in township twenty-two, of Marion county, Kansas, from paying their

proportionate indebtedness on all bonds authorized up to this date by said county." There were therefore, at the time of the division, certain bonds outstanding, which were a lien upon the detached territory, and the indebtedness evidenced by which bonds has never in fact been paid. The funding amounts to this, and nothing more: in lieu of one certain evidence of debt, another is issued. In consideration, it is true, of a change in the time and interest, a change was made in the amount promised to be paid. But this change was a reduction, and therefore a benefit to the debtor. Still, neither the one paper nor the other was the debt itself, but only the written evidence thereof. The debt remains the same. The change was in the evidence of that debt. Notwithstanding the financial theories popular with a few, the law does not yet recognize the substitution of one promise to pay for another as in fact a payment, and looks evermore beyond the form of the transaction to the substance thereof, and until the debt is in fact paid, it calls it in fact the same debt, notwithstanding many changes may be made in the evidences thereof. The books are full of cases in which, after a note and mortgage have been once executed, the note has been again and again renewed, and still the mortgage held as security for the debt, with all its original priorities. (*Pratt v. Topeka Bank,* 12 Kas. 572.) Nor does it make any difference that changes are made in the rate of interest, time of payment, or any other minor details, so long as the principal debt remains in fact unpaid. The same principle obtains here: the railroad bonds were legally issued; by statute they were a lien on the detached territory; that real estate was subject to taxation for their payment. The bonds have been exchanged for new ones, but the debt was unpaid in the exchange. The county received no new thing of value; made no promise in excess of that already outstanding. Changing time and rate of interest, it simply renewed a promise to pay the same debt. The funding bonds were therefore properly a debt against the detached territory. These are all the questions we deem it important to

3. Funding bonds, a charge against detached territory.

consider in reference to the question of the substantial liability of the detached territory for these debts; and as to both the bridge and the funding bonds, we hold that it is liable.

Other questions remain, but they run simply to the form and regularity of the proceedings; and the first one arises on the admission in the agreed statement of facts, that the levies of 1878 were made by the county board not within the limits of Marion county, but while acting as such without the state. The invalidity of such a levy has been adjudged by this court in *Comm'rs of Marion County v. Barker*, 25 Kas. 258. But it is insisted by the counsel for plaintiff, and we think correctly, that no such question is open for consideration under the pleadings. The defendant in its answer nowhere denies the allegations of the plaintiff's pleadings, but simply sets out a series of facts which it claims constitute so many defenses thereto. The seventh paragraph of the answer to which counsel refers simply puts in issue the sending of the certificate by the county clerk, and tenders no issue as to the validity of the levy. Neither do we find anywhere else in the pleadings any allegation in respect thereto; and as the agreed statement of facts was submitted subject to all objections for incompetency, under the pleadings this, although admitted to be a fact, is not a fact in issue, and may therefore be ignored.

4. Original case in supreme court; agreed facts; practice.

Another objection is, that it appears from the certificates sent by the county clerk of the one county to the county clerk of the other, that the county commissioners in making the levy simply fixed the rate per cent., instead of determining the amount to be raised for these several indebtednesses. We cannot think this a substantial defect; having the assessed value of the property before them, it can make no substantial difference whether the resolution of the commissioners declared that so much money in gross must be raised, or that a certain rate per cent. be levied for such tax; the result is the same, and a mere difference in the form of the expression ought not to weigh against the substantial rights of either party. Our tax

5. Tax in detached territory; certificate of county clerk.

law in general terms provides that no mere irregularity shall defeat tax titles.  The same principle controls here.  We are dealing with the substantial rights of these respective parties.  We are to determine what in fairness and justice either party may do or require, and nothing which does not go to the substance of things should be permitted to relieve this detached territory from paying its share of the debt which it assisted in creating.  Even if the matter alleged be a technical non-compliance with the letter of the statute, it is not in a controversy like this such a defect as will absolutely vitiate the levy.

It is insisted that the certificates actually sent by the one county clerk to the other were defective in this, that they did not fully inform the latter of the specific indebtedness for which the tax was levied, and all the details of such indebtedness, or of the territory embraced within such levy.  Three certificates for the three several years are shown.  We do not understand that these certificates are required to give a detailed history of all those circumstances connected with the creation of the indebtedness which justify an extension of the

6. Levy and certificate, valid. levy beyond the territorial limits of Marion county.  We are inclined to think that the certificates of 1878 and 1879 are sufficiently full and specific, while the certificate for 1880 is incomplete and defective.  If this proceeding reached only to the tax of the latter year, there would probably be no default until a more full and specific certificate was sent; but as mandamus must be issued to enforce the levies for the two prior years, and as the levy was undoubtedly properly made for the year 1880, we think the mandamus may fairly go for the levies for the three years.

A final objection involves a mathematical computation of the amount actually raised by levies already made, and the amount needed to pay the accruing indebtedness.  Counsel for the defendant contends that the levies already made and collected in Marion county have been sufficient to pay the bridge bonds and interest, and that the levy is excessive for the funding bonds.

So far as the bridge bonds are concerned, it does not appear that any levy was ever collected from the detached territory; and ignoring the levies for the last three years, which are now in controversy, it does not appear that the amounts collected in Marion county were sufficient to discharge this bridge indebtedness. This detached territory stands to Marion county in reference to this indebtedness precisely as though it remained still a part of such county, and we do not understand that the owner of one tract of land in a county can object to the payment of a tax levied upon his land on the ground that the other land-owners, having already paid the tax levied before he did, have paid into the county treasury enough to discharge the indebtedness. It is his duty to pay as they have paid, and if after all have paid there should chance to be some small surplus, it would be appropriated for the common benefit. It not unfrequently happens that the county commissioners in providing for any fund have made a levy so large that when all have paid there remains a slight surplus in the treasury, but we do not understand that under such circumstances any tax-payer can wait until all the rest have paid and then decline to pay his tax because by such payment a slight surplus will be found in the treasury.

Again, we cannot think that the levy made for the funding bonds discloses such an excess as justifies the court in restraining the collection. It is a matter notorious, that some property is always delinquent, and in levying to meet a specific debt, the commissioners are justified in taking into account the probable amount of such delinquency. The commissioners should provide for the debt; they should take into account the probable amount of such delinquency, and if

7. Levy, when not illegal for excess, etc.

the taxes should chance to be paid more fully and promptly than expected, and a sum in excess of the amount actually needed be raised, the fact does not vitiate the levy as to the delinquent lands. We see no such excess as justifies any interference with the proceedings. The fact remains undisputed and clear, that this detached territory has not contributed its share to the payment of this indebtedness.

Justice and equity require that it should bear its proportionate share of the burden, and having paid nothing, it is in a poor condition to complain that the levy is a trifle in excess of what it ought to be to fully discharge the debt. A large amount beyond anything already levied will assuredly be required in the future, and if in the final adjustment of this indebtedness it shall appear that the detached territory has already contributed more than its just share, it will then be time enough to equalize burdens. It is not pretended that the levy on the detached territory was other or different than that on the property in Marion county; thus far everything has been equal. The funding bonds are not yet paid, and until some inequality appears, or until the debt is fully paid, we think that the territory cannot be heard to complain.

These, we think, are all the substantial and important questions in the case. We have given the various matters full consideration, and we think that justice and fairness require that these levies should be enforced in the detached territory; that no sufficient legal objection has been shown thereto; and that therefore the mandamus must be issued as prayed for.

All the Justices concurring.