THAYER, Circuit Judge,
after stating the case as above, delivered the opinion of the court.
Inasmuch as the bill of exceptions fails to show that it contains all the evidence which was produced at the trial of the case, the point is well made, in behalf of the defendant, that the action of the lower court in directing a verdict for the defendant cannot be reviewed. Nor can any of the exceptions which were taken to the charge be reviewed, for, while the charge was somewhat lengthy, yet, as it concluded with a peremptory direction to the jury to return a verdict for the defendant, it must be treated by this court precisely as it would have been had the trial court, without any explanation of its views, simply directed a finding for the defendant. When a peremptory instruction is given, either in favor of the plaintiff or the defendant, the only question with respect to the charge which is open for consideration by an appellate tribunal is whether the direction to find for the one party or the other, when considered in the light of the pleadings and all the evidence, was right; and, if the bill of exceptions fails to disclose that it contains all the evidence, that question, for obvious reasons, cannot be noticed. Taylor-Craig Corp. v. Hage, 32 U. S. App. 548, 16 C. C. A. 339, and 69 Fed. 581; Association v. Robinson, 36 U. S. App. 690, 20 C. C. A. 262, and 74 Fed. 10.
It results from this view that the only question which can be considered on the present record is whether errors were committed in the *696 admission or exclusion of testimony. The first error of this sort which is assigned and argued consists in the action of the trial court in admitting in evidence the assessment lists of the county of Gunnison for the years 1880, 1881, and 1882, which were offered by the defendant. An examination of the record shows, however, that, while these assessment lists were objected to generally for immateriality when they were offered, yet no exception was saved when they were admitted. For this reason the objection to the assessment lists was waived, and cannot be noticed.
In addition to the assessment lists last mentioned, the defendant county also offered in evidence three statements purporting to be financial statements of Gunnison county, Colo., for the six months ending, respectively, on December 31,1881, June 30,1882, and December 30, 1882. To each of the aforesaid statements was appended a certificate of the board of county commissioners to the effect that it was a true, full, and correct statement of the financial condition of Gunnison county for the period which the statement purported to cover. Each statement, when offered in evidence, also bore a certificate, made by the county clerk of Gunnison county under his hand and seal, to the effect that the aforesaid statement was a full, true, and correct copy of the financial statement of Gunnison county for the period which it purported to cover, as the same appeared “in the records of Gunnison county, in Book of Statements,” at certain designated pages. These statements showed the total indebtedness of Gunnison county, consisting of bonds and warrants, to have been as follows: On December 31, 1881, $77,559.01; on June 30, 1882, $118,691.49; and on December 30, 1882, $284,763.05. They also showed on what account debts had been incurred by the county during the period covered thereby, and the names of many persons and firms in whose favor warrants had been drawn. The financial statements in question seem to have been prepared by the board of county commissioners for the purpose of complying with section 30 of an act passed by the legislature of the state of Colorado on March 24, 1877, entitled “An act concerning counties, county officers and county government, and repealing laws on these subjects.” Laws Colo. 1877, pp. 218, 237. The thirtieth section of said act, in substance, required the various boards of county commissioners throughout the state to make semiannual financial statements at their regular sessions in January and July of each year, showing, among other things, the total indebtedness of their respective counties at such periods, of what the indebtedness consisted, and the rate of interest paid thereon, which statements were required to be entered of record by the clerk of the county board in a book kept for that purpose, and to be published in some weekly paper,or to be posted in three conspicuous places in the county, if no newspaper was published therein. Another document which was offered in evidence by the defendant was a duly-certified copy of the record of proceedings of the board of county commissioners of Gunnison county, which had been taken under the act of February 21, 1881, quoted in the statement, by virtue of which proceedings certain floating indebtedness of the county had been funded, and the bonds in controversy had been issued. These proceedings contained, among other things, *697 a certificate made by tbe board of county commissioners showing that the floating indebtedness of the county of Gunnison was $174,115.29 on August 21,1882, when the first publication was made of the notice to warrant holders which was required to be given by the provisions of said act. The plaintiff objected to the admission of the financial statements and the record of the proceedings of the board, but they were admitted in evidence over such objection, and an exception was duly saved to their admission. This exception presents the question of chief importance which arises upon the record. We are constrained to hold that the financial statements to which reference has been made were not admissible in evidence against an innocent purchaser for value, before maturity, of funding bonds containing such recitals as those contained in the bonds in controversy. The funding act of February 21,1881, made it the duty of the board of county commissioners to determine the amount of the county indebtedness, and make a certificate thereof, and spread the same upon the records of the county, as one of the initial steps towards an issuance of funding bonds. The record discloses that such a determination was made and duly entered of record before the bonds in controversy were issued; and, such determination having been made by the board of county commissioners in obedience to the mandate of the statute, it is certainly entitled to as much credit as the semiannual statements made by the same board in pursuance of the provisions of the act of March 24, 1877. Indeed, when it is borne in mind that the board was required to determine the true amount of the county debt, as ■of the date of the first publication of the notice to warrant holders, if the county proposed to issue funding bonds, and when it is also borne in mind that the indebtedness of the county was liable to great fluctuations between the dates of the several semiannual statements, it is fair to presume that the statement of the total county debt for which provision was made in the funding act was the only authentic statement of such indebtedness which the legislature intended should be consulted, either by warrant holders, or other persons who might be concerned in the issuance of funding bonds. In the case of Sutliff v. Commissioners, 147 IT. S. 230, 13 Sup. Ct. 318, it was held that a purchaser of bonds issued by a county of Colorado under section 21 of the act of March 24, 1877, supra, was charged with the duty of examining statements of the financial condition of the county which had been made by the board of county commissioners pursuant to section 30 of the same act, notwithstanding a recital contained in the bonds “that all the provisions of said act have been fully complied with by the proper officers in the issuing of this bond.” But the two cases—the one at bar and that case—are not parallel, in this: that the bonds involved in the present suit were not issued under the act of March 24, 1877, but under an act which, in the very first section conferring the power to issue funding bonds, also made provision for a judicial determination of the amount of the county indebtedness, before such bonds were issued, and also required such determination to be made as of the date of the proposed issue. We do not understand the decision in the Sutliff Case to go to the extent of holding that a bond purchaser must, at his peril, examine every record of *698 county indebtedness which has been made by county officials, pursuant to the provisions of a statute, with a view of satisfying himself that the constitutional limit of indebtedness has not been exceeded.. Even if such is the rule where, in cases like the Sutliff Case, the bonds-do not contain an express recital that the issue does not exceed the-constitutional limit, yet it ought not to be applied to a case like the-one in hand, where the bonds do contain a certificate “that the total amount of this issue does not exceed the limit prescribed by the constitution of the state of Colorado.” When, as in the present case, it' appears that there are two acts, passed at different times, each making provision for an official statement of the county indebtedness to-be made at different times, one of which statements is required to be-made with express reference to an issue of bonds, and as one of the-preliminary steps to that end, we think it is reasonable to conclude-that a purchaser of the bonds is, at most, only charged with the duty of examining the latter statement. If a discrepancy exists between the two statements, it is clear, we think, that that statement should govern and control which was made with express reference to an issue-of bonds, and presumably for the information of the bondholder, and that the bondholder should only be charged with the duty of examining the statement on which he has a right to rely.
It is contended on the part of the plaintiff that a purchaser of the funding bonds in controversy, in view of the recitals therein contained,. • was not even chargeable with notice of the certificate made by the board of county commissioners, showing the county indebtedness on August 21, 1882, to have been $174,115.29; but we have not found it necessary to consider that proposition, and shall express no opinion thereon. It may be conceded, though not decided, that a purchaser of the bonds in question was affected with notice of all the facts disclosed by the record of the proceedings of the board which culminated in the issuance of the bonds; but, notwithstanding this concession,, we are of opinion that the record made by the board of county commissioners disclosed no facts rendering the bonds void in the-hands of an innocent purchaser for value. These bonds contained a recital, heretofore quoted, to the effect that the amount issued did not exceed the constitutional limit of indebtedness; and the certificate-made by the board, showing the total county indebtedness, as of August 21, 1882, did not pretend to state when that indebtedness was created. Moreover, the bonds on their face purported to be funding-bonds issued “for valid floating indebtedness,” which would not create a new debt, assuming the warrants for which they were issued to have been valid, but would simply change the form of an existing indebtedness. In re State Bonds (Me.) 18 Atl. 291; Powell v. City of Madison, 107 Ind. 110, 8 N. E. 31; City of Los Angeles v. Teed (Cal.) 44 Pac. 580; Commissioners of Marion County v. Commissioners of Harvey County, 26 Kan. 181, 201; Hotchkiss v. Marion, 12 Mont. 218, 29 Pac. 821; Miller v. School Dist. No. 3 (Wyo.) 39 Pac. 879. A purchaser of the bonds, therefore, who examined one of them, or the-whole issue, for that matter, in the light of the constitutional provision- and the certificate made by the board, would have been unable to say that the aforesaid recital was false, and that the bonds were void, for *699 the reason that the entire debt certified to by the board might have been created before the assessed value of county property reached the $1,000,000 mark, until which time there were no restrictions upon the power of the county to contract debts. If, upon any theory, the bonds might be valid notwithstanding the fact that the county debt was $174,115.29 on August 21, 1882, a purchaser of the bonds was entitled to presume that such was the fact, that the recitals were true, and that the constitution had not been violated. National Life Ins. Co. v. Board of Education, 27 U. S. App. 244, 10 C. C. A. 637, and 62 Fed. 778, and cases there cited; Chaffee Co. v. Potter, 142 U. S. 355, 363, 364, 12 Sup. Ct. 216; Evansville v. Dennett, 161 U. S. 434, 443, 16 Sup. Ct. 613. It results from this view of the case that, as against a bona fide holder of the funding bonds in controversy, the certified copy of the proceedings of the board of county commissioners, which was admitted in evidence, was at least immaterial testimony.
Another item of proof which was admitted by the trial court over an objection duly made by the plaintiff consisted of three lists of county warrants which had been surrendered to the county by the owners and holders thereof when the ten funding bonds which are involved in the present suit were issued. With reference to these lists, it is sufficient to say that on three occasions a large number of warrants appear to have been surrendered to the county in exchange for funding bonds, and that the bonds in suit, being Nos. 9 to 13, both inclusive, 63 to 66, both inclusive, and No. 98, formed a part of the three issues of bonds which had thus been put in circulation. It did not appear, however, that any particular warrants had been exchanged for any particular bond, but that a large number of warrants—-in one instance, warrants amounting to $49,896—had been exchanged for an equivalent sum in bonds. This testimony appears-to have been offered for the purpose of showing, by the production of the warrants and an examination of their dates, that the indebtedness represented by the funding bonds in suit had been created after the constitutional inhibition against contracting debts beyond a certain amount had become applicable to Gunnison county, by reason of it® assessed valuation having reached an amount exceeding $1,000,000. That limit appears to have been attained for the first time by the assessment made for the year 1.881. It follows from the views which we have heretofore expressed that the lists of warrants in question were inadmissible, against a bona fide purchaser of bonds, to contradict and overcome the recitals which the bonds in controversy contain. A purchaser of such securities for value, in the open market, can neither be expected nor required to examine the warrants issued for the original indebtedness, ivith a view of ascertaining when the debt was contracted, especially when the bonds contain such explicit representations as the bonds in suit contain. No case, we believe, has ever imposed a burden of that kind upon the bondholder.
We have thus far considered the admissibility of the foregoing testimony from the standpoint occupied by an innocent purchaser of the bonds for value, and before maturity; but, as the question is raised whether the plaintiff corporation is armed with the rights of a bona fide holder as to any of the bonds in suit, it becomes necessary to- *700 notice that contention. The testimony contained in the present rec■ord. shows, we think, without contradiction, that the plaintiff was a bona fide holder, when the suit was brought, of at least five of the bonds which are involved in the present controversy, because it holds the title of Joseph Stanley, who was himself an innocent purchaser of said bonds, before maturity, for the price of 98 cents on the dollar. The rights which Stanley acquired by virtue of such purchase inure to the plaintiff, by virtue of its purchase of the bonds from Stanley in June, 1892, and this without reference to any knowledge which the plaintiff may have had at the latter date affecting the validity of the securities. A bona fide holder of commercial paper is entitled to transfer to a third party all the rights with which he is vested, and the title so acquired by his indorsee cannot be affected by proof that the indorsee was acquainted with the defenses existing against the paper. Commissioners v. Clark, 94 U. S. 278, 286; Hill v. Scotland Co., 34 Fed. 208; Daniels, Neg. Inst. § 803, and cases there cited. The rights of the plaintiff with respect to the remaining five bonds, which it also purchased from Stanley, may be different, as Stanley appears to have .received the remaining five bonds direct from the county of Gunnison, in exchange for warrants which he owned and held, instead of purchasing the bonds in the open market. Whether the plaintiff acquired the last-mentioned bonds under circumstances which constitute it a bona fide holder is a question which may require the consideration of a jury, and we shall not undertake to decide it on the facts preserved in, the present record. The testimony above considered appears to have been admitted by the trial court on the assumption that it was competent, even as against a bona fide purchaser of funding bonds, for the purpose of impeaching the bonds; and, as we cannot concur in that view, the judgment of the circuit court must be reversed, and the cause remanded for a new trial. It is so ordered.